IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Hanan AlOmran and Abdulaziz R. Alyaqout,
individually and on behalf of all others similarly situated,

Plaintiffs,                    Civil Action No. _____

v.

Marriott Vacations Worldwide Corporation;
Jonathan Cabrera; James Martinez; and
Maria LNU,
Defendants.

_____/

**CLASS ACTION COMPLAINT**
**(JURY TRIAL DEMANDED)**

Plaintiffs Hanan AlOmran (a citizen of Kuwait) and Abdulaziz R. Alyaqout (a citizen of
Florida), individually and on behalf of all others similarly situated ("Class," defined
below), allege as follows:

---

## I. PARTIES

---

1. Plaintiff Hanan AlOmran is a natural person and citizen of Kuwait residing in Kuwait City, Kuwait. She purchased Marriott Vacation Club Trust Points in Miami Beach, Florida, on 17 August 2022.[1]

2. Plaintiff Abdulaziz R. Alyaqout is a natural person and citizen of Florida residing in Miami, Florida. He is co-owner of the Trust Points purchased with Plaintiff AlOmran.

3. Defendant Marriott Vacations Worldwide Corporation ("Marriott") is a Delaware corporation with its principal place of business in Orlando, Florida.

4. Defendant Jonathan Cabrera is, on information and belief, a citizen of Florida and a former Marriott sales representative who worked at 404 Washington Avenue, Miami Beach, Florida.

5. Defendant James Martinez is, on information and belief, a citizen of Florida and a former Marriott sales manager at the same sales gallery.

6. Defendant Maria LNU (last name unknown) is, on information and belief, a citizen of Florida who acted as a supervisory sales executive in the transaction at issue.

---

## II. JURISDICTION AND VENUE

---

7. Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).
This action is a "class action" within the meaning of § 1332(d)(1)(B), and the Court has subject-matter jurisdiction because:

a. Minimal diversity. Plaintiff AlOmran is a citizen of Kuwait; Marriott is a citizen of Delaware and Florida. § 1332(d)(2)(B).

b. Class size. On information and belief, the proposed Class exceeds 100 members. § 1332(d)(5)(B).

c. Amount in controversy. Aggregating purchase prices, maintenance fees, punitive damages, and attorneys' fees, the controversy exceeds $5 million, exclusive of interest and costs. Based on

an average purchase price of approximately $40,000 and an estimated 2,000 Class members, the aggregate amount in controversy exceeds $80 million. § 1332(d)(2).

To the extent Marriott contends a separate document requires arbitration, Plaintiffs plead that any such clause is unenforceable because the entire contract set was procured by fraud.

d. No CAFA exceptions. Fewer than two-thirds of Class members are citizens of Florida, and Marriott's misconduct was nationwide. §§ 1332(d)(3) -(4).

8.  The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

9.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events occurred at Marriott's Miami Beach sales gallery.

------------------------------------------------------------
III. FACTUAL BACKGROUND
------------------------------------------------------------

10. On 21 July 2022, at approximately 11:15 a.m., inside Cabrera's office located at 404 Washington Ave., Miami Beach, Florida, Defendants Cabrera and Martinez conducted a sales presentation with Plaintiffs. — *The deed was formally recorded on 17 August 2022, but the operative contract signatures occurred on 27–28 July 2022 (see Exhibits A-1 & A-2).*

11. Cabrera stated: "**If you ever want out, Marriott will buy the points back at market value—guaranteed.**" [2]

12. Cabrera added that Marriott maintained an "active buy-back program" and that, because of inflation, "Marriott actually prefers to repurchase points because they're worth more to us later."

13. Martinez and Maria LNU confirmed these representations, assuring Plaintiffs that exiting would be "easy" and Marriott would "handle everything."

14. Relying on these statements, Plaintiffs purchased **5,000 Trust Points for $65,454.83** (purchase price $64,300.00 + closing costs $1,154.83). The executed 36-page contract is attached as **Exhibit A-2**.

15. **No arbitration clause.** The fully executed contract (*Exhibit A-2*) contains **no arbitration clause or class-action waiver** on any of its 36 pages. If Marriott later produces a separate document purporting to compel arbitration, that clause is unenforceable because the contract was procured by fraud. [3] The Purchase Agreement's own merger clause states: "This Agreement constitutes the entire agreement between the parties and supersedes all prior oral representations, **except for claims based on fraud or intentional misrepresentation.**" (*Exhibit A-2*) The absence of any arbitration provision precludes a stay under 9 U.S.C. § 3. **In the alternative, even if an arbitration clause exists, Plaintiffs allege it**

was fraudulently induced and is therefore unenforceable under *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010).

16. April 7, 2025, Exit-Services denial. In April 2025 Plaintiffs contacted Marriott Exit Services to invoke the promised buy-back through the Owner platform and, on **April 7 2025** Wanda, an Exit Services specialist, confirmed in writing that 'the only option we have is a title transfer back to Marriott' and that if Plaintiffs wished to sell, 'the only option will be to sell on the open market.' (Exhibit B).

17. On April 4, 2025, Marriott Owner Services directed Plaintiffs to 'contact our Exit Services team' for all resale inquiries, providing only a web link and declining further assistance. (Exhibit C).

18. **Total payments to Marriott.** As of this filing Plaintiffs have paid $77,589.34 to Marriott Vacation Club: **$64,300.00** purchase price, **$1,154.83** closing costs (total **$65,454.83**), plus **$12,134.51** in 2023-2025 maintenance fees. (See Exhibit D.)

A. Improper Substitution of Contract & Layered Inducement Scheme

19. On **21 July 2022**, inside sales executive **Jonathan Cabrera's office** at Marriott's gallery located at **404 Washington Avenue, Miami Beach, Florida**—with sales manager **James Martinez** joining later—Marriott conducted an **hours-long presentation that ran into the evening**, promised a buy-back program, and, after the gallery had closed, printed a 22-page purchase-agreement packet; **Plaintiffs left without signing any documents that day.**

20. **Instruction to return (22 July 2022).** On **22 July 2022** Marriott staff telephoned Plaintiffs, stated the paperwork was "wrong," and asked them to return the following week to "re-sign." [23]

21. **Retrieval and second signing (27 – 28 July 2022).** Plaintiffs returned on **27 July 2022** and executed the 22-page packet printed 21 July. The next morning, **28 July 2022**, Marriott summoned Plaintiffs again, retrieved the fully executed 27 July packet, and presented a new 36-page packet—without disclosing any differences.

22. Three gallery visits, two contract versions, and a layered inducement scheme. Marriott generated two distinct contract packets before any signature was placed:

(a)  A 22-page packet printed at 6:58 PM on 21 July 2022 (Exhibit A-1).  Plaintiffs first saw this version on 27 July 2022 and executed it that day.

(b)  A 36-page "Contract for Purchase" packet printed at 10:36 AM on 25 July 2022 (Exhibit A-2).  Marriott concealed this expanded version until 28 July 2022, when Plaintiffs were summoned again and required to sign "corrected paperwork" after Marriott admitted the prior packet was wrong.

Printing at 6:58 PM on a Thursday and demanding execution outside normal business hours underscores the high-pressure tactics barred by Fla. Stat. § 721.10(2)(a). If late-night printing were routine, Marriott would not have re-printed the packet at 10:36 AM the following Monday. **Notably, Page 36 of Exhibit A-2 bears the 21 July footer and duplicates Page 29, proving Marriott spliced pages from two print runs.**

To secure immediate execution of each successive packet, Marriott offered a multi-layered incentive bundle:

•10 K Vacation Club PlusPoints™ (printed 21 Jul 2022, Exhibit L-1) and re-issued on 25 Jul 2022 (Exhibit L-2);

• Villa-Week Gift Letter #1 dated 21 Jul 2022, signed by James Martinez (Exhibit M-1);

• Villa-Week Gift Letter #2 dated 27 Jul 2022, bearing a new customer number and signed by Jubassi Goitia (Exhibit M-2); and

• Two Interval International "Bonus Week" certificates—#67972832 and #70077896 (Exhibits O-1 and O-2).

Because pages present in Exhibit A-1 are missing from Exhibit A-2 (and vice-versa), Plaintiffs cannot know whether material terms—such as a buy-back clause—were removed.

**23. Duplicate letters & new customer number.** The **27 July 2022** villa-week letter (Exhibit M-2) bears Customer No. **11871513**, whereas the 21 July letter (Exhibit M-1) shows Customer No. **11160177**. The second customer number confirms Marriott opened a replacement contract file before Plaintiffs re-signed.

24. Contemporaneous WhatsApp messages confirm the orchestration: on 28 July 2022 James Martinez texted, "Just wanted to follow up to see when it would be a good time… to meet you to sign a few papers," and, in a voice note the same morning, admitted: "Jonathan is really embarrassed… Denaliya was given the wrong paperwork and that's why we just need to sign a few." (Both messages are included in Exhibit G[23].) He later thanked Plaintiffs on 25 August 2022 for their "patience during your purchase."

25. *Repackaged "courtesy."* Although the 10 K Vacation Club PlusPoints™certificate bears the original **July 21, 2022,** timestamp, Marriott later portrayed those same points—together with a second Interval week—as a special concession to induce execution of the substitute contract. [20]

26. The removal of the original agreement, the secret substitution, and the layered inducements together constitute **fraud in the inducement**, **unfair or deceptive conduct** under **FDUTPA**, and "high-pressure" sales tactics barred by **Florida Statutes § 721.10(2)(a)**. Plaintiffs reserve the right to seek spoliation sanctions and an adverse inference that the lost July 21 contract contained materially favorable terms.

B. Marriott's Deliberate Use of Staff Turnover to Evade Accountability

27. On 17 April 2025, Marriott Customer Advocacy supervisor **Desiree Fritz** e-mailed Plaintiffs (the "Fritz E-mail"), acknowledging that both salespeople involved—Jonathan Cabrera and James Martinez— "no longer work for the organization," and stating that Marriott was therefore "unable to gain additional perspective on what took place during your presentation." [9]

28. The Fritz E-mail further states that Marriott "must rely on the developer's commitment conveyed in the purchase documents" and will not honor any verbal representations, instead suggesting Plaintiffs pursue a third-party resale to "recuperate some of your purchase costs." (See **Exhibit E**.)

29. Marriott's response confirms a **systematic practice**:
    a. induce purchases through verbal guarantees;
    b. omit those guarantees from written contracts;
    c. disclaim responsibility once the sales staff leave the company; and
    d. refuse refunds while continuing to profit from maintenance fees.

30. Similar consumer complaints, BBB reports, and the **Finerman** class action demonstrate that Marriott has used this turnover-and-disclaim tactic for years, making the misconduct **willful and systemic** rather than accidental. [10] [12_14]

31. Plaintiffs will show through discovery that Marriott trains Customer Advocacy staff to rely exclusively on written documents and to deny relief whenever the responsible salesperson is no longer employed, thereby insulating Marriott from liability while perpetuating the deception. [11]

C. Admissions by Sales Management Confirm Fraud and Systemic Practice

32. On April 7, 2025, at approximately 12:54 p.m., former sales manager James Martinez texted Plaintiff Alyaqout: "You have to call [Customer Advocacy] and tell them the sales executive misled you—misrepresented the program—and that you demand they buy it back." (emphasis added) Martinez further instructed Plaintiffs to emphasize that the executive "is no longer with the company," confirming Marriott's practice of cycling out staff to avoid accountability. This admission demonstrates that Marriott had no existing buy-back program at the time of sale, as further confirmed by the Exit Services' January 2025 e-mail denying any such program (Exhibit B). [19]

**Florida Rule 1.450 / Fed. R. Evid. 801(d)(2)(D)** (sales manager's admission of a party-opponent).

33.   During the same chat, Martinez told Plaintiffs that Marriott "will push it up the chain," implicitly acknowledging a corporate-level protocol for handling misrepresentation complaints.

34.   In separate messages on April 10, 2025, sales representative **Jonathan Cabrera** admitted that he had "*already gotten people out of contracts with Marriott because Maria [a Marriott manager] lied to me*," and blamed management for feeding false information. [20] Cabrera's statement corroborates that:

    a.   **Multiple owners** were given similar false promises;
    b.   Marriott's misconduct was **systemic and directed from management**.

35.   These contemporaneous admissions refute any "rogue employee" defense and constitute direct evidence of fraudulent inducement, negligent misrepresentation, and a willful violation of FDUTPA.

---------------------------------------------------------------

IV.  CLAIMS FOR RELIEF

---------------------------------------------------------------

COUNT I – FRAUDULENT INDUCEMENT

36.  Plaintiffs incorporate by reference ¶¶ 1-35.

37.  Defendants knowingly or recklessly represented that Marriott would "guarantee" a buy-back of the Trust Points at market value.

38.  Defendants intended that Plaintiffs rely on these representations in deciding to purchase the Trust Points.

39.  Plaintiffs reasonably relied on and, as a direct result, paid approximately $65,000 and have incurred ongoing maintenance fees.

40.  Defendants' conduct constitutes intentional misconduct or gross negligence under Fla. Stat. § 768.72, entitling Plaintiffs to punitive damages. [4] Plaintiffs have a reasonable basis for recovery of punitive damages based on Defendants' systemic policy of inducing sales through misrepresentations and then disclaiming those promises through staff turnover.

COUNT II – NEGLIGENT MISREPRESENTATION (pled in the alternative)

41.  Plaintiffs incorporate by reference ¶¶ 1-40.

42. Defendants owed Plaintiffs a duty of reasonable care in conveying accurate information about the Marriott Vacation Club program.

43. Defendants breached that duty by supplying false information regarding an existing buy-back program when, in fact, none existed.

44. Plaintiffs justifiably relied upon the information to their detriment.

45. As a proximate result, Plaintiffs suffered damages in an amount to be proven at trial.

COUNT III – PROMISSORY ESTOPPEL / (IN THE ALTERNATIVE)
BREACH OF CONTRACT

46. Plaintiffs incorporate by reference ¶¶ 1-45.
47. Defendants made a clear and definite promise that Marriott would repurchase the Trust Points at market value upon request.

48. Plaintiffs reasonably and foreseeably relied on that promise in purchasing the Trust Points.

49. Injustice can be avoided only by enforcing the promise or awarding restitution rescinding the transaction.

COUNT IV – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE
        PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 ET SEQ.

50. Plaintiffs incorporate by reference ¶¶ 1-49.

51. Defendants engaged in unfair and deceptive acts in violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 et seq., by: (a) falsely representing the existence of a guaranteed buy-back program; and (b) failing to disclose that no such program exists.

52. Such acts and practices were likely to mislead, and did mislead, consumers acting reasonably under the circumstances.

53. Plaintiffs suffered actual damages—including the purchase price and maintenance fees—as a direct result of Defendants' conduct.

54. Plaintiffs provided written pre-suit notice via multiple emails to Marriott Customer Advocacy—including an April 7, 2025, formal buy-back demand and an April 17 2025 notice of intent to sue— **(collectively, Exhibit H, Threads 1 & 2).** These communications identified the alleged misconduct and offered Marriott a final opportunity to resolve the matter privately. This satisfies the notice requirements of Fla. Stat. § 501.211(2); therefore Plaintiffs seek actual damages, statutory attorneys' fees, and injunctive relief under § 501.2105.[5]

55. Defendants have adopted a deliberate policy of disavowing sales misrepresentations by terminating or disclaiming responsibility for the employees involved, as evidenced by the Fritz E-mail (Exhibit E), which instructs Plaintiffs that Marriott will "rely on the purchase documents" because the sales staff "no longer work for the organization."

**Illusory Point & Week Benefits**

56. Defendants misrepresented the availability and value of the incentives promised to Plaintiffs, including **(i) 10K Vacation Club PlusPoints™, (ii) two Interval International "Bonus Week" certificates, and (iii) two villa-week certificates**. In practice, the promised accommodations were either impossible to book or subject to unilateral cancellation by Marriott, rendering the inducements illusory and constituting an "unfair or deceptive act" under **Florida Statutes § 501.204(1)**. [21]

**Bonvoy Exchange Program**

57. Defendants further misrepresented the flexibility of converting Trust Points into **Marriott Bonvoy™ points** by failing to disclose that Marriott may "amend, suspend, or terminate the Exchange Program at any time, with or without notice" (Program Rules § 1.6, **Exhibit I**). This undisclosed limitation renders the touted benefit illusory and materially diminishes the value of the purchase. [22]

COUNT V – UNJUST ENRICHMENT (pled in the alternative)

58. Plaintiffs incorporate by reference ¶¶ 1-57.

59. Plaintiffs conferred a benefit on Defendants by paying the purchase price and ongoing maintenance fees.

60. Defendants voluntarily accepted and retained that benefit.

61. It would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs in an amount to be proven at trial.

---------------------------------------------------------------

V.  CLASS ALLEGATIONS

---------------------------------------------------------------

62. Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Plaintiffs seek to represent the following Class (the "Class"):

"All persons anywhere in the world who, on or after 1 January 2018, purchased Marriott Vacation Club Trust Points after Marriott sales staff represented that Marriott would repurchase or facilitate resale of those points."

Excluded from the Class are Defendants, their officers and directors, members of the immediate families of the foregoing, and the Court and its personnel.

Excluded from the Class are claims barred by applicable statutes of limitation, except where equitable tolling applies.

63. **Numerosity (Rule 23(a)(1)).** Marriott's annual SEC filings disclose more than 200,000 active Trust-Point owners[7] and, on information and belief, thousands purchased during the Class Period. Joinder of all Class members is therefore impracticable.

64. **Commonality (Rule 23(a)(2)).** Common questions of law and fact include, without limitation:
    a. Whether Defendants orally represented that a guaranteed buy-back or resale program existed;
    b. Whether those representations were false or misleading;
    c. Whether Defendants knew or should have known the representations were false;
    d. Whether Defendants' conduct violates FDUTPA and other consumer protection statutes; and
    e. The appropriate measure of Class-wide damages or restitution.

65. **Typicality (Rule 23(a)(3)).** Plaintiffs' claims arise from the same uniform sales practices and are based on the same legal theories as every other Class member; they are therefore typical.

66. **Adequacy (Rule 23(a)(4)).** Plaintiffs have no conflicts with the Class and will fairly and adequately protect Class interests. Plaintiffs have retained, or will retain, counsel experienced in consumer-fraud and class litigation.

67. **Predominance (Rule 23(b)(3)).** The common questions identified above predominate over any individual issues because liability turns on standardized oral scripts used by Marriott sales staff and Marriott's centralized exit policies.[8] Damages can be calculated on a Class-wide basis using Marriott's transactional data.

68. **Superiority & Manageability (Rule 23(b)(3)).** A single class action is superior to hundreds or thousands of individual suits, avoids inconsistent judgments, and conserves judicial resources. No unusual manageability issues are

anticipated. Plaintiffs will move for certification after class discovery.

69. Plaintiffs intend to retain qualified class counsel and will promptly move for appointment under Rule 23(g).

-------------------------------------------------------------
VI.  SYSTEMIC PATTERN & TREND EVIDENCE
-------------------------------------------------------------

70. Plaintiffs' experience is not isolated.  A growing body of consumer complaints, forum posts, and lawsuits from 2016 through 2025 shows that Marriott Vacation Club routinely misrepresents the existence of resale or buy-back options during its sales presentations.

71. **Public complaints mirror Plaintiffs' allegations,** describing nearly identical scenarios in which sales staff promised an easy exit only for Marriott later to deny any such program:
   • "We were told we could sell the timeshare back – for what we paid – and now I find out that is NOT true." (BBB Complaint #202116, 29 Dec 2020). [12]
   • "They said I'd have access to resale options, then refused to help and blamed 'corporate.'" (Reddit post, r/marriott, 18 Apr 2025). [13]
   • "Marriott Vacation Club never once told me this contract would last forever… they corner you into agreements that only benefit them." (ConsumerAffairs review, 29 Apr 2025). [14]

72. A **time-series analysis of verified complaints (Exhibit F)** shows a steady rise from five documented cases in 2020 to ten in 2025—with no meaningful corrective action by Marriott. [15]

73. Courts have already recognized these tactics.  In **Finerman v. Marriott Vacations Worldwide Corp.,** No. 3:14-cv-01154-TJC-MCR (M.D. Fla.), Marriott paid $25 million to settle class claims that it made false promises of exit options.  Earlier, **Lennen v. Marriott** alleged deception about ownership structure and fees in MVC sales. [16]

74. The uptick in complaints despite the **Finerman** settlement, combined with Marriott's documented refusal to investigate verbal misrepresentations (¶¶ 19-26), demonstrates a **deliberate, systemic course of conduct** rather than isolated negligence.

75. This pattern satisfies the "willful" and "systematic" elements for punitive damages under Florida law and supports Rule 23(b)(3) predominance by

showing that the same misrepresentations were made to the entire Class.

76. Plaintiffs attach the trend chart as **Exhibit F** and will submit sworn
    declarations authenticating the complaint dataset at the appropriate stage.

---

## VII.  SUPPORTING PRECEDENTS

---

• **Finerman v. Marriott Vacations Worldwide Corp.,** No. 3:14-cv-01154-TJC-MCR,
  2018 WL 4716232 (M.D. Fla. 15 Aug 2018) – $25 million class settlement. [6]

• **Friar v. Wyndham Vacation Resorts, Inc.,** No. 1:20-cv-02627-JPO,
  2021 WL 1080393 (S.D.N.Y. 19 Mar 2021).

• **Devino v. Marriott Ownership Resorts, Inc.,** Final Judgment & Order, ECF No. 222
  (M.D. Fla. 15 Aug 2018).

• **Lowery v. Alabama Power Co.,** 483 F.3d 1184 (11th Cir. 2007).

• **Cavalieri v. Avior Airlines C.A.,** 25 F.4th 843 (11th Cir. 2022).

---

## VIII. PRAYER FOR RELIEF

---

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the
Court:

A.  Award actual (compensatory) damages to Plaintiffs and Class members in an amount to be
proven at trial;

B.  Enter rescission of the sales contracts and order restitution of all consideration paid, including
maintenance fees, or, in the alternative, award restitution under the doctrine of unjust
enrichment;

C.  Award punitive damages pursuant to Fla. Stat. §§ 768.72–.73[17] in an amount:
    (i) up to the greater of three (3) times the compensatory damages awarded or five hundred
thousand dollars (US $500,000) per Class member; **or**
    (ii) should the evidence establish that Defendants' conduct was motivated primarily by
unreasonable financial gain, up to the greater of four (4) times the compensatory damages
awarded, or two million dollars (US $2,000,000) per Class member;

D.  Award reasonable attorneys' fees and taxable costs under Fla. Stat. § 501.2105 and any other applicable fee-shifting provision;

E.  Grant injunctive relief requiring corrective disclosures in all U.S. Marriott sales galleries and on Marriott Vacation Club websites, and enjoining Defendants from further deceptive or unfair sales practices;

F.  Award pre- and post-judgment interest at the maximum rate permitted by law; and

G.  Grant such other and further relief as the Court deems just and proper.

H.  Plaintiffs will seek discovery of internal print logs, CRM entries, and communications regarding any issuance, cancellation, or modification of incentive certificates tied to Customer Nos. 11160177 and 11871513.

-------------------------------------------------------------
## IX. DEMAND FOR JURY TRIAL
-------------------------------------------------------------

Plaintiffs demand a trial by jury on all issues so triable.


Respectfully submitted,


_____
Abdulaziz R. Alyaqout, *pro se*
820 Euclid Ave. Apt 308
Miami Beach, Florida 33139
+1(718) 902-5895
a.r.alyaqout@gmail.com

Executed on May 17, 2025.


_____
Hanan B. AlOmran, *pro se*
Block 6 Street 605 House 32
AlSalamh, Kuwait 47706
+965 94400041
sfadiamond@gmail.com

Executed on May 17, 2025.


14